**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

**U.S. BANK NATIONAL ASSOCIATION, ET AL.,**

                **Plaintiffs,**

      - against -

**BFPRU I, LLC, ET AL.,**

                **Defendants.**

─────────────────────────────────

**16-cv-01450 (JGK)**

<u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    This action arises out of a dispute between the plaintiffs, U.S. Bank National Association and Wells Fargo Bank, N.A., (collectively, the "Lender"); the defendants and third party plaintiffs, BFPRU I LLC, (the "Borrower") and Mark Karasick and Michael Silberberg (the "Guarantors"); and the third party defendant, the Lender's loan servicer, LNR Partners, LLC ("LNR"). The defendants move to dismiss the plaintiffs' First Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This motion is **denied**. LNR moves to dismiss the defendants' third party complaint. This motion is **granted.**

                        I.

    The following facts alleged in the First Amended Complaint and the third party complaint are accepted as true for purposes of the pending motions.

In 2013, the Lender and Borrower modified a Loan Agreement related to a $410 million  commercial mortgage loan (the "Loan") secured by two commercial buildings in Chicago, One Prudential Plaza and Two Prudential Plaza (the "Property") by entering into an Amended Loan Agreement. First Am. Compl. ("FAC") ¶ 1, ECF No. 31.  The Amended Loan Agreement bifurcated the loan into a $336 million "A" Note and a $74 million "B" Note.  FAC ¶ 25.

The Amended Loan Agreement provided that the Borrower could prepay the loan upon a "Refinancing Capital Event."  FAC ¶ 1, 27-28.  To initiate a Refinancing Capital Event, the Borrower would notify the Lender by providing the proposed terms of a refinancing offered by a separate third-party lender.  FAC ¶ 28. The Borrower and Lender would then each obtain "as is" appraisals of the Property that "conform[] to the requirements for appraisals relied upon by regulated financial institutions." FAC ¶ 29.  If the appraisals were within 5% of each other, the "Appraised Fair Market Value" would be 96% of the average of the two appraisals, and this figure would be used to calculate the amount required to secure a release of the Property.  FAC ¶ 30-31.  The Amended Loan Agreement also stated that the Borrower would "cooperate with and timely provide any and all information as may be reasonably requested by the Lender's appraiser in order to complete [the] appraisal."  FAC ¶ 29 (quoting Am. Loan Agmt. § 3.6(c), Edwards Decl. Ex. 1, ECF No. 37).  The Loan

Agreement and Amended Loan Agreement stated that the failure to satisfy these obligations constituted an Event of Default.  See FAC ¶¶ 79-80.  Further, as part of the modification, the Guarantors signed a Guaranty Agreement agreeing to be held liable to the Lender for any losses sustained by the Lender arising out of or in connection with "any fraud, willful misconduct or intentional material misrepresentation by Borrower . . . or by any Guarantor in connection with the Loan."  FAC ¶ 84.

The Borrower initiated a Refinancing Capital Event on April 2, 2015, and the Lender then engaged Integra Realty Resources ("IRR") on April 21, 2015 to perform an appraisal on the Property.  FAC ¶ 32-35.  The following day, IRR submitted a written request to the Borrower's managing agent for the Property, Jones Lang LaSalle ("JLL") for information related to the Property, including a specific request for all leasing information and "information on leases under negotiation."  FAC ¶ 35.  JLL responded to the request by providing information on various types of leasing activity, but did not provide any information relating to leases under negotiation.  FAC ¶ 38-39.  JLL also provided financial projections to IRR forecasting a decline in leasing at the Property.  FAC ¶ 39.

Based on the information provided by JLL, IRR completed its appraisal on May 27, 2015 and arrived at an "as is" value of the

3

Property of $430,000,000 as of May 12, 2015.  FAC ¶ 41.  The
Borrower's appraiser, Butler Burgher Group ("BBG") completed its
appraisal on May 26, 2015, arriving at an "as is" value of
$427,400,000 as of April 8, 2015.  FAC ¶ 42.  Based on these two
appraisals, the Appraised Fair Market Value was determined to be
$411,552,000.  FAC ¶ 43.

The Refinancing Capital Event was set to close on July 30,
2015, and in anticipation of the closing, the Borrower and
Guarantors provided a Certification to the Lender.  FAC ¶ 44.
The Certification stated that the Borrower and Guarantors, "as
of this 30th day of July, 2015," had "provided all financial,
operating and leasing information about the Property" to the
Lender, to IRR, and BBG; that "[a]ll such financial, operating
and leasing information provided to Lender, [IRR] and [BBG] is
complete, true and accurate in all respects"; and that "[n]one
of Borrower or any Guarantor is aware of any additional
financial, operating or leasing information that would have a
material effect on the value of the Property."  FAC ¶ 44
(quoting Certification ¶ 1, Kapoor Decl. Ex. 3, ECF No. 39).

Upon closing, as a result of the priority of payment
schedule outlined in the Amended Loan Agreement, the Lender
received full repayment for the A-note, but received no payment
for the B-note.  FAC ¶¶ 2, 74-75, 97.  Thereafter, the Lender
learned that a newly refinanced loan made to the Borrower and

secured by the Property was being marketed in a prospectus that valued the Property at $642,000,000.  FAC ¶ 47.  The valuation was based on an "as is" appraisal performed by CBRE Inc. as of June 24, 2015, which, according to the plaintiffs, used the same methodology as the Borrower and Lender appraisals.  FAC ¶ 4, 47.

The plaintiffs allege that the CBRE appraisal exceeded the other appraisals because the CBRE appraisal incorporated the terms of several pending leases that were determined to have a high probability of being fully executed.  FAC ¶ 53.  The plaintiffs allege that the defendants or their agents participated in these lease negotiations, that they had knowledge of these lease negotiations, and that all property leases required approval by the Guarantors prior to execution. FAC ¶¶ 60-62.

According to the defendants' third party complaint, a majority of these new leases were disclosed to the plaintiffs' loan servicer and the third party defendant, LNR, in connection with the Borrower's May 2015 and June 2015 property reserve disbursement requests for tenant improvements and third party leasing brokerage commissions.  Third Party Compl. ("TPC") ¶ 41, ECF No. 13.  LNR provided loan servicing to the Lender pursuant to a Pooling and Servicing Agreement (the "PSA"), to which the defendants were not a party.  See TPC ¶ 52; PSA, TPC Ex. 6.  The PSA further specified that nonparties such as the Borrower and

5

Guarantors had no benefits, rights, remedies or claims under the PSA. PSA ¶ 12.08 at 298. Finally, as part of the July 30, 2015 closing of the Refinancing Capital Event, the defendants signed a General Release that "absolutely, unconditionally, and irrevocably waive[d]" any claims against LNR. See General Release, Kapoor Decl. Ex. 4, ECF No. 39.

The plaintiffs filed suit, alleging (1) breach of contract against the Borrower; (2) breach of contract against the Guarantors; (3) fraudulent concealment and misrepresentation against the Borrower and Guarantors; (4) negligent omission and misrepresentation against the Borrower and the Guarantors; and (5) unjust enrichment against the Borrower. FAC ¶¶ 88-157. The defendants move to dismiss the plaintiffs' claims.

The defendants filed a third party complaint against LNR for (1) negligent omission; (2) contribution; and (3) indemnification. LNR moves to dismiss the defendants' claims.

II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at

6

trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

The same principles apply to the motion to dismiss the complaint and the motion to dismiss the third party complaint. See, e.g., Elastic Wonder, Inc. v. Posey, No. 13-cv-5603 (JGK), 2015 WL 273691, at *1 (S.D.N.Y. Jan. 22, 2015).

III.

The defendants maintain that all of the plaintiffs' claims should be dismissed.  The parties agree that New York law is the governing law to be applied and the Court can accept that agreement.  See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

7

A.

The defendants argue that the plaintiffs' fraud and
negligent misrepresentation claims should be dismissed because
they are duplicative of their breach of contract claims, and
because the fraud and negligent misrepresentation claims fail to
satisfy Rule 9(b) of the Federal Rules of Civil Procedure.

1.

"[U]nder New York law, parallel fraud and contract claims
may be brought if the plaintiff (1) demonstrates a legal duty
separate from the duty to perform under the contract; (2) points
to a fraudulent misrepresentation that is collateral or
extraneous to the contract; or (3) seeks special damages that
are unrecoverable as contract damages." Merrill Lynch & Co.
Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir.
2007).

A duty to disclose separate from the duty to perform under
the contract may arise "where one party possesses superior
knowledge, not readily available to the other, and knows that
the other is acting on the basis of mistaken knowledge." TVT
Records v. Island Def Jam Music Grp., 412 F.3d 82, 91 (2d Cir.
2005) (quoting Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150
(2d Cir. 1993)).

A duty to disclose separate from a contractual duty may
also arise if the defendants made a partial or ambiguous

8

statement that required additional disclosure in order to avoid misleading the other party.  See id.; see also Brass, 987 F.2d at 150 (noting that under New York law, a duty to disclose exists "where [a] party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.").

A plaintiff may also bring parallel fraud and breach of contract claims when there are "[m]isrepresentations of present facts made post-contract formation [that] are collateral or extraneous to the contract." Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 520-21 (S.D.N.Y. 2016); see also Eagle Comtronics, Inc. v. Pico Products Inc., 682 N.Y.S.2d 505, 507 (App. Div. 1998) ("Plaintiff does not allege merely that Defendant entered into the contract while misrepresenting its intent to perform as agreed, but alleges that, after the contract was entered into, defendant repeatedly misrepresented or concealed existing facts." (citation omitted)); but see Madison Capital Co., LLC v. Alasia, LLC, 615 F. Supp. 2d 233, 240 (S.D.N.Y. 2009) (determining that a plaintiff was barred from bringing both a negligent misrepresentation claim and a breach of contract claim stemming from alleged misstatements in contractually required certifications, but without addressing whether such alleged

misstatements could be considered misrepresentations of present facts made post-contract formation).

Here, the plaintiffs' allegations support their claim that defendants had a special duty to the plaintiffs based on superior knowledge.  The plaintiffs allege that the defendants had exclusive knowledge regarding information about leases under negotiation not readily available to the plaintiffs, including a listing of the specific leases allegedly under negotiation as of July 30, 2015 that were ultimately executed.  They further assert that because the defendants and their agents failed to provide information related to the leases under negotiation despite a specific request to do so, the defendants were aware that the plaintiffs were preparing an appraisal "on the basis of mistaken knowledge."  TVT Records, 412 F.3d at 91.  These factual allegations lead to the reasonable inference that the defendants had a duty based on superior knowledge to disclose the leases under negotiation to the plaintiffs, thereby permitting the plaintiffs to plead fraud and negligent misrepresentation claims in addition to breach of contract claims.

Moreover, the plaintiffs allege that the defendants, through their agents, provided incomplete disclosures related to leasing activity and leases under negotiation, which also included a forecasted decline in leasing activity that was

10

ultimately inaccurate.  By only providing information on certain leases and disregarding a specific request to provide information on leases under negotiation, the defendants allegedly made partial or misleading statements regarding the leasing activity at the Property that required additional disclosures in order to avoid deceiving the plaintiffs.  See id. These factual allegations thus also support the claim that the defendants had a duty to disclose separate from their contractual duties, which, in turn, support the plaintiffs' ability to plead fraud and negligent misrepresentation claims in addition to breach of contract claims.

The plaintiffs' ability to bring claims for fraud and negligent misrepresentation is further supported by the plaintiffs' allegations of a misrepresentation collateral or extraneous to the contract.  See Merrill Lynch, 500 F.3d at 183. Here, the Certification stated that as of July 30, 2015, the defendants had "provided all financial, operating and leasing information" to the Lender, IRR, and BBG as part of the appraisals and that all such information was "complete, true, and accurate in all respects."  Certification ¶ 1.  The Certification also stated that "[n]one of the Borrower or any Guarantor [was] aware of any additional financial, operating, or leasing information that would have a material effect on the value of the Property."  Id.  Contrary to the defendants'

11

representations in the Certification, the plaintiffs list numerous executed leases that were allegedly under negotiation as of July 30, 2015, including thirteen leases that were ultimately executed on or before July 31, 2015.  Such allegations support a reasonable inference that the July 30, 2015 Certification contained "[m]isrepresentations of present facts made post-contract formation" that were "collateral or extraneous" to the Loan Agreement and Amended Loan Agreement, and were therefore potentially "actionable in fraud."  Minnie Rose, 169 F. Supp. 3d at 520.  Accordingly, the alleged misrepresentations in the Certification are an additional basis to permit the plaintiffs to pursue fraud and negligent misrepresentation claims in addition to breach of contract claims.

The defendants rely on several cases that are easily distinguishable.  They cite Vitrano v. State Farm Ins. Co., No. 08-cv-00103 (JGK), 2008 WL 2696156 (S.D.N.Y. July 8, 2008).  But there, the claims "rest[ed] solely on [a] defendant's alleged failure to honor [an] insurance policy, which is a claim for breach of contract." Id. at *3.  Absent in Vitrano were any allegations that the defendant had superior knowledge that gave rise to a duty to disclose, that the defendants disclosed partial or misleading information that would trigger a duty to provide additional information, or that there were alleged

misrepresentations collateral or extraneous to the contract. See id.  Therefore, Vitrano is not analogous to this case.

The defendants also attempt to draw support from Almeciga v. Ctr. for Investigative Reporting, Inc., No. 15-cv-4319 (JSR), 2016 WL 2621131, at *4 (S.D.N.Y. May 6, 2016) (publication pending).  However, in Almeciga, the plaintiff's fraud claims were dismissed because the only additional allegation apart from the breach of contract claim was that the defendant never intended to perform the contract, and because it was plain that the plaintiff had not relied on any of the allegedly fraudulent activity.  See id. at *4.  By contrast, the allegations here go beyond mere claims that the defendants never intended to perform under the relevant contract because the plaintiff alleges that the defendants made fraudulent or negligent misrepresentations in the July 30, 2015 Certification.  Moreover, the plaintiffs allegedly relied on these representations in order to complete the Refinancing Capital Event.

In sum, there is no basis at the motion to dismiss stage to dismiss the plaintiffs' fraud and negligent misrepresentation claims as duplicative of their breach of contract claims.

### 2.

The defendants also contend that the fraud and negligent misrepresentation claims should be dismissed because they do not satisfy the particularity requirement of Rule 9(b) of the

Federal Rules of Civil Procedure.  Rule 9(b) provides that "[i]n
alleging fraud or mistake, a party must state with particularity
the circumstances constituting fraud or mistake. Malice, intent,
knowledge, and other conditions of a person's mind may be
alleged generally." Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b),
a complaint must "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent." Mills v. Polar Molecular Corp., 12
F.3d 1170, 1175 (2d Cir. 1993). Although Rule 9(b) allows a
plaintiff to allege fraudulent intent generally, a plaintiff
must allege facts that give rise to a strong inference of
fraudulent intent.  Shields v. Citytrust Bancorp, Inc., 25 F.3d
1124, 1128 (2d Cir. 1994). This strong inference can be
established either "(a) by alleging facts to show that
defendants had both motive and opportunity to commit fraud, or
(b) by alleging facts that constitute strong circumstantial
evidence of conscious misbehavior or recklessness." Id.; see
also S.E.C. v. Ballesteros Franco, 253 F. Supp. 2d 720, 731–32
(S.D.N.Y. 2003).  "[A]llegations of motive are sufficient if
they 'entail concrete benefits that could be realized by one or
more of the false statements and wrongful disclosures alleged.'"
Marcus v. Frome, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004)
(quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)).

14

Further, "opportunity 'entail[s] the means and likely prospect of achieving concrete benefits by the means alleged.'" <u>Marcus</u>, 329 F. Supp. 2d at 473 (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000)).

Here, the plaintiffs' First Amended Complaint satisfies the requirements of Rule 9(b). The Complaint alleges that the defendants' loan servicer failed to disclose leases under negotiation despite a specific request to do so, and also points to statements made in the Certification, signed by all defendants, that allegedly misrepresented the accuracy and completeness of the leasing information previously disclosed to the plaintiffs.[1]

Moreover, the First Amended Complaint sufficiently alleges a motive to commit fraud by pointing to concrete benefits received by the defendants. The plaintiffs state that the Guarantors are the 100% beneficial owners of the Borrower who

[1] Though cited by the defendants, <u>Bigsby v. Barclays Capital Real Estate, Inc.</u>, 170 F. Supp. 3d 568 (S.D.N.Y. 2016) and <u>Ferring B.V. v. Allergan, Inc.</u>, 932 F. Supp. 2d 493 (S.D.N.Y. 2013) are not analogous to this case. In <u>Bigsby</u>, this Court concluded that Rule 9(b) was not satisfied when the complaint contained no specific misrepresentations and failed to "allege when and where the misrepresentations were made and who made them." 170 F. Supp. at 577. Similarly in <u>Ferring</u>, the complaint was inadequate because it had "not identified, when, where, or how [the] alleged misrepresentations or omissions occurred." 932 F. Supp. 2d at 512. By contrast, the First Amended Complaint here points specifically to omissions made by the defendants' loan servicer and the alleged misstatements in the defendants' Certification.

received, among other benefits, the ability to avoid paying $83 million while still obtaining a release of the Lender's liens against the property, escaped having to contribute personal funds to achieve the Refinancing Capital Event, avoided the risk of a maturity default and foreclosure sale while retaining ownership of the Property, and extinguished their Guaranty of the loan obligations.  Such factual allegations plainly "entail concrete benefits that could be realized" as a result of alleged misrepresentations about leasing activity at the Property. Kalnit, 264 F.3d at 139.  The plaintiffs also sufficiently allege an opportunity to commit fraud because the defendants initiated the Refinancing Capital Event, had exclusive access to the leasing information that they allegedly failed to disclose, and signed the purportedly false Certification.[2]  Therefore, the defendants had the "means and likely prospect of achieving the concrete benefits" of the Refinancing Capital Event.  Novak, 216 F.3d at 307.

The defendants also argue that any claims arising out of the July 30, 2015 Certification should be dismissed because the

_____

[2] While the defendants take issue with the fact that the First Amended Complaint makes claims based "upon information and belief," such allegations can be sufficient to satisfy Rule 9(b) where, as here, they relate to "matters particularly within the opposing party's knowledge" that are "accompanied by statements of facts upon which the belief is founded."  PI, Inc. v. Ogle, 932 F. Supp. 80, 83-84 (S.D.N.Y. 1996) (citing Luce v. Edelstein, 802 F.2d 49, 54 n.1 (2d Cir. 1986)).

16

Certification was actually true.  The Certification stated that
"as of this 30th day of July 2015," that "[n]one of the Borrower
or any Guarantor is aware of any additional financial, operating
or leasing information that would have a material effect on the
value of the Property."  Certification ¶ 1.  According to the
defendants, the term "value of the Property" should be
interpreted to mean the value of the Property as of the date of
the IRR appraisal, May 12, 2015.  However, a reasonable
interpretation of the Certification is that it brought any prior
representations up to the date as of the signing of the
Certification and the signatories could not withhold material
information that arose after the appraisals and before the
signing of the Certification.  At the very least, the Court
could not decide as a matter of law that the defendants'
proposed interpretation of the Certification is correct.
Moreover, the term "value of the property" in Paragraph 1 of the
Certification is not limited to the value of the property at the
time of the appraisal, while Paragraph 2 of the Certification
does refer specifically to the report of the Borrower's
appraiser.  See Certification ¶ 2 ("The appraisal report of the
Property dated May 26, 2015 prepared by Borrower's Appraiser was
prepared based on true, complete and accurate information
provided by or on behalf of Borrower or Guarantors."); see also
Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d

17

458, 467 (2d Cir. 2010) ("[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity."); Vt. Teddy Bear Co. v. 538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004) (noting that in real property transactions between sophisticated parties, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" (citation omitted)).

The First Amended Complaint states that the CBRE appraisal incorporated leases under negotiation and appraised the value of the Property to be $642,000,000 as of June 24, 2015, while the IRR appraisal did not incorporate these leases and valued the Property at $430,000,000 as of May 12, 2015. Accordingly, at the motion to dismiss stage, the Court could not conclude as a matter of law that the information that influenced the CBRE appraisal so significantly did not have a "material effect on the value of the Property" as stated in the Certification as of July 30, 2015. While the defendants urge the Court to interpret the Certification based on the "commercial realities" of the transaction, doing so at this stage would be premature without factual input as to what exactly such commercial realities entail. See Air Italy S.p.A. v. Aviation Tech., Inc., No. 10-cv-20(JG), 2010 WL 2925949, at *5 (E.D.N.Y. July 21, 2010).

The defendants also raise a number of arguments claiming the inadequacy of the pleadings in relation to JLL.  JLL, a party not named as a defendant in this litigation, managed the Property for the defendants and allegedly failed to provide to the plaintiffs' appraiser information regarding leases under negotiation.  "The fraudulent statements of an agent, when made within the scope of its agency, are attributable to the principal." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cir. 2005) (determining that allegations of incomplete disclosures in documents sent by an agent "on behalf of" a defendant were sufficient to satisfy Rule 9(b)). "It is black-letter agency law in New York that an employer is liable for the representations of its agents when those representations are made within the scope of the agent's employment." Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 453 (S.D.N.Y. 2007).  However, allegations of misconduct by a non-defendant employee, standing alone, are insufficient to satisfy Rule 9(b) unless accompanied by adequate factual allegations supporting an inference that a named defendant acted with scienter.  See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006); Ret. Bd. of the Policemen's Annuity v. FXCM Inc., No. 15-cv-3599 (KMW), 2016 WL 4435243, at *7 (S.D.N.Y. Aug. 18, 2016).

Here, there are sufficient factual allegations that support the inference that the named defendants acted with scienter because of the motive and opportunity to make the alleged misstatements in the Certification.  Such statements were allegedly misleading because JLL had previously failed to disclose information related to leases under negotiation, despite a specific request for this information.  Accordingly, there is a sufficient connection between the alleged misconduct of the named defendants and the alleged misconduct of their agents such that the defendants could plausibly be "liable for the representations of its agent[]." Glidepath, 590 F. Supp. at 453.  The First Amended Complaint satisfies the requirements of Rule 9(b).

B.

The defendants argue that the plaintiffs' breach of contract claims must be dismissed as a matter of law.  "In order to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 142 (2d Cir. 2011).  The plaintiffs allege that the defendants breached the Loan Agreement and the Amended Loan Agreement by failing to "cooperate with and timely provide any and all information as may be reasonably requested by Lender's

20

appraiser," Am. Loan. Agmt. § 3.6(c); failing to "obtain a
Qualified Appraisal" that "conforms to the requirements for
appraisals relied upon by regulated financial institutions,"
id.; and failing to "otherwise satisf[y]" the conditions of
Section 3.6 of the Amended Loan Agreement.  FAC ¶¶ 79, 92, 96.

The defendants first contend that the plaintiffs have
waived any breach of contract claim because its appraiser, IRR,
proceeded to complete its appraisal despite lacking information
on leases under negotiation.  But that argument is plainly
undermined by the "no-waiver" clauses within the Loan Agreement.
See Loan Agmt. § 10.4, Kapoor Decl. Ex. 1, ECF No. 39 (No waiver
"unless the same shall be in a writing signed by the party
against whom enforcement is sought"); Id. § 10.5 ("Neither any
failure nor any delay on the part of Lender in insisting upon
strict performance . . . shall operate as or constitute a waiver
thereof."); Id. § 8.2(d) ("The rights, powers and remedies of
Lender under this Agreement shall be cumulative and not
exclusive of any other right, power or remedy which Lender may
have against Borrower.").  Provisions such as these are
routinely enforced by courts and apply here.  See, e.g., MBIA
Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682,
709 (S.D.N.Y. 2012) ("When a contract contains a 'no waiver'
clause . . . a non-breaching party can continue his contract
instead of terminating it based on breaches that previously

21

occurred and yet not waive any of his rights under the contract."); <u>Maxim Grp. LLC v. Life Partners Holdings, Inc.</u>, 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (collecting cases). Accordingly, the defendants' contention that the plaintiffs have waived any breach of contract claim is without merit.

The defendants further contend that the breach of contract claim against the Guarantors should fail because, pursuant to the Guaranty Agreement, the Guarantors only guaranteed the Lender's losses arising out of or in connection with "fraud, willful misconduct or intentional material misrepresentation by Borrower . . . or by any Guarantor in connection with the Loan." <u>See</u> FAC ¶ 84-85, 102.  The defendants also reference New York Civil Practice Law and Rules ("CPLR") § 7601, which provides for a special proceeding to enforce an agreement for a valuation or appraisal, and assert that the principles of CPLR § 7601 apply to this case such that a challenge to an appraisal is permitted "only so far as the appraisal was the product of 'fraud, bias or bad faith.'"  <u>Forbes v. Cendant Corp.</u>, 205 F.3d 1322 (table), No. 99-9180, 2000 WL 232069, at *2 (2d Cir. Jan. 28, 2000) (quoting <u>Liberty Fabrics, Inc. v. Corp. Properties Assocs. 5</u>, 636 N.Y.S.2d 781, 781 (App. Div. 1996)).  But even if it were the case that the terms of the Guaranty Agreement or the

22

principles underlying CPLR § 7601[3] would bar the plaintiffs'
breach of contract claim unless fraud were adequately alleged,
this argument is moot where, as here, the plaintiffs have
adequately pleaded with particularity factual allegations
sufficient to satisfy Rule 9(b) in support of their fraud
claims.

In sum, the plaintiffs' factual allegations are sufficient
to state a facially plausible breach of contract claim.

C.

The defendants maintain that the plaintiffs' unjust
enrichment claim against the Borrower should be dismissed
because it is duplicative of the breach of contract claim.
Unjust enrichment claims are "available only in unusual
situations when, though the defendant has not breached a
contract nor committed a recognized tort, circumstances create
an equitable obligation running from the defendant to the
plaintiff." Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177,
1185 (N.Y. 2012). "The existence of a valid and enforceable
written contract governing a particular subject matter

_____

[3] The defendants do not contend that the plaintiffs were required
to bring a petition under § 7601, but rather that it represents
the public policy of the state of New York with respect to
appraisals. Indeed, § 7601 uses permissive rather than
mandatory language. See N.Y. C.P.L.R. § 7601 ("A special
proceeding may be commenced to specifically enforce an agreement
that a question of valuation, appraisal or other issue or
controversy be determined by a person named or to be
selected.").

23

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006) (quoting Clark–Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)).  "However, even though Plaintiffs may not ultimately recover under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to plead such claims in the alternative." Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (collecting cases).  A court may allow a breach of contract and an unjust enrichment claim to proceed past the motion to dismiss stage when the validity or scope of the contract is difficult to determine. Hildene Capital Mgmt., LLC v. Friedman, Billings, RamseGrp., Inc., No. 11-cv-5832 (AJN), 2012 WL 3542196, at *11 (S.D.N.Y. Aug. 15, 2012).

Here, the scope of the contractual obligations remains disputed.  It is unclear whether defendants failed to "cooperate with and timely provide any and all information as may be reasonably requested by Lender's appraiser."  Am. Loan. Agmt. § 3.6(c).  It is further unknown whether the defendants failed to "obtain a Qualified Appraisal" that "conforms to the requirements for appraisals relied upon by regulated financial institutions."  Id.  And it is at this stage undetermined

whether the statements made in the Certification were actually true based on commercial realities.  Therefore, the possibility remains that "the defendant has not breached a contract nor committed a recognized tort," but that "circumstances create an equitable obligation running from the defendant[s] to the plaintiff[s]." Corsello, 967 N.E.2d at 1185.  Because the scope of the contractual obligations and further factual developments regarding the conduct of the parties have yet to be determined, dismissing the plaintiffs' unjust enrichment claim at this stage would be premature.  The Court will therefore not dismiss the plaintiffs' unjust enrichment claim.

D.

The defendants also argue that the plaintiffs' claim for a breach of Section 8.1(b) of the Loan Agreement should be dismissed because it is an impermissible liquidated damages provision.  Section 8.1(b) states:

> Upon the occurrence of an Event of Default .
> . . and at any time thereafter . . . Lender
> may take such action, without notice or
> demand . . . including, without limitation,
> declaring the Debt to be immediately due and
> payable . . . the Debt and all other
> obligations of Borrower hereunder and under
> the other Loan Documents shall immediately
> and automatically become due and payable,
> without notice or demand . . . . [4]

---

[4] The defendants' alternative argument that the plaintiffs' claim fails because the Lender did not "declar[e] the Debt to be immediately due and payable" is meritless because Sections 8.1(b) and 8.2 of the Loan Agreement states that the full debt

Loan Agmt. § 8.1(b).  Contrary to the defendants' contention,
this language does not operate as a liquidated damages
provision.  See G3-Purves St., LLC v. Thomson Purves, LLC, 953
N.Y.S.2d 109, 114 (App. Div. 2012) (holding that a provision of
a guaranty was not a liquidated damages provision because "the
loan agreement only provides for the recovery of actual damages
incurred by the lender, to wit, the debt remaining on the unpaid
loan at the time of default, which is an amount fixed by the
terms of the loan and is not speculative or incalculable").  The
defendants' argument that Section 8.1(b) is a liquidated damages
provision is without merit.

The defendants' motion to dismiss the plaintiffs' complaint
is denied.

IV.

The defendants have filed a third party complaint against
the third party defendant LNR for (1) negligent omission, (2)
contribution, and (3) indemnification.  LNR moves to dismiss the
third party complaint on the grounds that: (1) a General Release
signed by the defendants bars their claims; and (2) the third
party complaint fails to plead factual allegations that support

---

can be declared due "without notice or demand," and that, upon
default, the Lender may exercise any remedy "whether or not . .
. the Debt [is] declared due and payable."  Loan Agmt. §§
8.1(b), 8.2.  Moreover, this argument ignores that the Loan
matured on June 1, 2016, and thus all amounts are currently due
and payable.  See Loan Agmt. § 1.1; Am. Loan Agmt. § 3.3(e).

the reasonable inference that LNR is liable for the misconduct alleged.

A.

LNR first points to a General Release signed by the defendants that, according to LNR, bars the claims asserted in the third party complaint. "Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release." Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 952 N.E.2d 995, 1000, 1001-02 (N.Y. 2011) (quotation marks and citation omitted) (concluding that a release barred a plaintiff's claims because "[a]s sophisticated entities, they negotiated and executed an extraordinarily broad release with their eyes wide open").

Here, the terms of the General Release, signed by sophisticated entities, are quite broad.  It states that the defendants:

> [A]bsolutely, unconditionally and irrevocably ha[ve] waived, remised, released, acquitted, satisfied, and forever discharged, . . . each Lender Party from and against any matter and all manner of . . . claims . . . and causes of action of any nature whatsoever . . . known or unknown . . which any Borrower Party now has or claimed to have had or hereafter can, shall or may have the right to assert by any reason of any matter . . . occurring from the beginning of the world to and including the date of this Release arising out of or relating to, whether directly or indirectly (a) the Loan and all documents evidencing,

> securing guaranteeing or otherwise related
> to the Loan . . . and the administration of
> the Loan. . . .

General Release at 1.  The General Release also specifically includes the defendants, BFPRU I LLC, Karasick, Silberberg, as well as the third party defendant LNR in the definition of "Lenders Party."  See id.  By its broad terms, the General Release plainly bars the defendants' claims against LNR.

The defendants present several arguments why the General Release does not apply to its claims, but each is unpersuasive. First, the defendants contend that the release does not bar their indemnity claim because it arose after the July 30, 2015 date of the release.  But in making its indemnification claim, the third party complaint points specifically to LNR's alleged receipt of purported leasing information about new tenants as part of the defendants' reserve disbursement requests for May 2015 and June 2015, while making no mention of any acts committed by LNR after July 30, 2015.  TPC ¶ 78.  Accordingly, the General Release is plainly applicable and bars the defendants' indemnification claim.

The defendants argue that the General Release does not bar the defendants' claim for negligent misrepresentation because it fails to mention the term "negligence" or a word of similar import.  But courts have interpreted the broad terms of similar releases to bar claims for negligent misrepresentation.  See,

28

e.g., Engel v. Deutsche Bank Nat'l Tr. Co., 983 N.Y.S.2d 630,
631-32 (App. Div. 2014) (affirming the dismissal of a negligent
representation claim arising from a loan modification based on a
general release of claims "by reason of any matter, cause or
thing whatsoever from the beginning of the world to the day of
the date of this RELEASE"); Palmatier v. Lockheed Martin Corp.,
No. 13-cv-133 (DNH), 2014 WL 1466489, at *3-4 (N.D.N.Y. Apr. 15,
2014) (concluding that a general release of "any and all claims,
liabilities, demands, and causes of action of any kind . . .
which Plaintiff has, had, or may have at the time of the signing
of this release" barred plaintiff's negligent misrepresentation
claim).  Similarly, the broad terms of the General Release in
this case bars the defendants' claims against LNR.

    The defendants unsuccessfully attempt to rely on Gross v.
Sweet, 400 N.E.2d 306, 307-08 (N.Y. 1979) (concluding that a
general release signed by an enrollee of a parachute jumping
school did not bar his negligence claim when, after one hour of
on-land training, the enrollee was flown to an altitude of 2,800
feet for his first practice jump).  Putting aside the unique
facts of Gross that make it distinguishable, the court in Gross
made clear that the general rule of strict judicial construction
of releases was less stringent for agreements that were
"negotiated at arm's length between sophisticated business
entities, and which can be viewed as merely allocating the risk

of liability to third parties between themselves." <u>See</u> <u>id.</u> at 310 (citation and quotation marks omitted).  Here, the defendants make no claim that the General Release was not negotiated at arm's length, and it is plain that the defendants are sophisticated entities.[5]  <u>See</u> Am. Loan Agmt. § 6.2 ("Borrower and each Guarantor represent, warrant and agree that . . . each is a sophisticated commercial party.").  Accordingly, <u>Gross</u> is not helpful to the defendants, especially considering the cases in which courts have interpreted similarly worded releases to bar negligent misrepresentation claims.  <u>See e.g.</u>, <u>Engel</u>, 983 N.Y.S.2d at 631-32; <u>Palmatier</u>, 2014 WL 1466489, at *3-4.

The General Release bars the defendants' negligent misrepresentation and implied indemnification claims, and the defendants provide no explanation as to why its contribution claim is not barred by the General Release.  Because the defendants, "[a]s sophisticated entities . . . negotiated and executed an extraordinarily broad release with their eyes wide open," each of the defendants' claims are barred.  <u>Centro Empresarial Cempresa S.A.</u>, 952 N.E.2d at 1002.

---

[5]  While the defendants attempt to rely on <u>Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry</u>, 494 N.Y.S.2d 721, 722 (App. Div. 1985), the lack of a sophisticated plaintiff in that case makes it likewise inapplicable.  <u>See</u> <u>id.</u> (concluding that a general release signed by a patient in the midst of a dental examination while reclining in a dentist chair under a bright light prior to obtaining reduced cost dental services from postgraduate dentists did not bar the patient's malpractice claim).

B.

Moreover, the third party complaint should also be
dismissed as inadequately pleaded.

The negligent misrepresentation claim is inadequate because
the defendants have failed to plead factual allegations that
support a reasonable inference that a special relationship
existed between the defendants and LNR.  "To prevail on a claim
of negligent misrepresentation under New York law, a plaintiff
must show '(1) the existence of a special or privity-like
relationship imposing a duty on the defendant to impart correct
information to the plaintiff; (2) that the information was
incorrect; and (3) reasonable reliance on the information.'"
Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d
Cir. 2014) (quoting J.A.O. Acquisition Corp. v. Stavitsky, 863
N.E.2d 585, 587 (N.Y. 2007)).

The defendants assert that they had a "special
relationship" with LNR because LNR was the Special Servicer of
the loan and negotiated the Amended Loan Agreement.  But LNR
acted in its capacity as the special servicer of the loan, a
position that was created and defined by the PSA.  The
defendants are not parties to the PSA between LNR and the
Lender, and courts "have generally held that a nonparty to a PSA
lacks standing to assert noncompliance with the PSA . . . unless
the non-party is an intended (not merely incidental) third-party

31

beneficiary of the PSA." <u>Anh Nguyet Tran. v. Bank of N.Y.</u>, No. 13-cv-580 (RPP), 2014 WL 1225575, at *4 (S.D.N.Y. Mar. 24, 2014) (collecting cases); <u>see also</u> <u>BNP Paribas Mortg. Corp. v. Bank of Am., N.A.</u>, 949 F. Supp. 2d 486, 510 (S.D.N.Y. 2013).  Here, the PSA clarifies that the defendants are not intended third-party beneficiaries, stating that "[n]o other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement."  PSA § 12.08 at 298.

Despite not being parties to the PSA, the defendants allege that a special relationship existed between LNR and the defendants by attempting to liken this case to <u>Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC</u>, 692 F.3d 42 (2d Cir. 2012).  The comparison is unpersuasive.

In <u>Bayerische</u>, the court determined that a plaintiff investor could enforce a legal duty arising from representations made by the defendant investment manager in order to induce the plaintiff to invest. <u>Id</u>. at 58-59.  The court noted that the defendant, in furtherance of its inducement of the plaintiff, made specific representations that the investments would be investment grade, that it would manage the investments in a conservative and defensive manner, and that it would uphold its duties and responsibilities as outlined in the Portfolio Management Agreement ("PMA").  <u>See id.</u>  While acknowledging that

the plaintiff was not a party to the PMA, the court concluded
that due to the defendant's solicitations of the plaintiff for
the investments, and the defendant's representation that it
would manage the investments in the plaintiff's favor, the
plaintiff had alleged a sufficiently close relationship to
establish a duty running from the defendants to the plaintiffs.
Id. at 61.

Here, the defendants' third party complaint is devoid of
any factual allegations that suggest that LNR induced the
defendants in any way.  Also absent are any allegations that LNR
made specific representations to the defendants regarding LNR's
obligations under the PSA.[6]  See 2002 Lawrence R. Buchalter
Alaska Trust v. Philadelphia Fin. Life Assur. Co., 96 F. Supp.
3d 182, 222 (S.D.N.Y. 2015) (no legal duty existed where
defendant made no representations to plaintiffs).  Accordingly,
Bayerische is inapplicable.[7]

---

[6] The defendants briefly point to a Pre-Negotiation Letter
between LNR and the Borrower in an attempt to establish a
special relationship that would impose a duty on LNR running to
the defendants.  See TPC ¶ 49; TPC Ex. 5 ("Pre-Negotiation
Letter").  But the letter makes clear that LNR was acting as a
"representative of [the] Lender," makes no representations that
LNR was acting on behalf of the defendants, and contains no
statements regarding LNR's obligations under the PSA that could
reasonably be construed as creating a duty on the part of LNR to
the defendants.

[7] The defendants are not helped by Glanzer v. Shepard, 135 N.E.
275 (N.Y. 1922), which held that the defendants, public weighers
of beans, had a duty to the plaintiff bean purchasers because
the defendants had "held themselves out to the public as skilled

The defendants also claim that LNR had a duty to the defendants based on superior knowledge of its own contractual obligations under the PSA.  However, this claim plainly fails because a party's "superior knowledge about the particulars of [its] own business practices is insufficient to sustain a negligent misrepresentation claim."  KCG Americas LLC v. Brazilmed, LLC, 15-cv-4600(AT), 2016 WL 900396, at *7 (S.D.N.Y. Feb. 26, 2016) (quoting MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 928 N.Y.S.2d 229, 235-36 (App. Div. 2011)). In sum, the third party complaint's factual allegations do not support a reasonable inference that LNR had a special duty to the defendants, and as a result, the defendants' claim for negligent misrepresentation is inadequately pleaded.[8]

The defendants also fail to make a facially plausible claim for contribution.  A third party complaint for contribution should be dismissed where the third party defendant (LNR) acted

---

and careful in their calling" and had sent certificates with false weights to plaintiff purchasers with knowledge that doing so would "induce" payment.  See id. at 275-76.  By contrast, the defendants here fail to allege that LNR made any such representations in order to induce the defendants to take any action whatsoever.

[8] It is unclear whether the defendants' claim against LNR should be construed as a negligent misrepresentation claim or a simple negligence claim.  In any event, any such distinction is irrelevant because the defendants cannot establish a duty running from LNR to the defendants, a requirement under both doctrines.  Moreover, the lack of any duty running from LNR to the defendants moots the parties' dispute about whether the particularity requirement of Rule 9(b) applies to a negligent misrepresentation claim.

as the agent of the original plaintiff (the Lender) throughout the transaction in question, because any culpable conduct of the third party defendant can be attributed to the plaintiff.  Ames Assocs. v. ABS Partners Real Estate LLC, No. 06-cv-928(TPG), 2010 WL 890034, at *4 (S.D.N.Y. Mar. 3, 2010) (dismissing a third party complaint for contribution against the representative of a property owner in a case involving underlying claims of fraud, breach of contract, and negligence); N.Y. Islanders Hockey Club, LLP v. Comerica Bank-Tex., 115 F. Supp. 2d 348, 351 (E.D.N.Y. 2000); Gabriel Capital L.P. v. Natwest Fin., Inc., 137 F. Supp. 2d 251, 266 (S.D.N.Y. 2000). Here, LNR was a disclosed representative of the plaintiff Lender. See TPC, Ex. 5 ("Pre-negotiation Letter") at 1 (describing LNR as the "representative of Lender" with the authority to act "on behalf of Lender"); see also Loan Agmt. § 9.6 ("Lender may delegate all or any portion of its responsibilities under th[e] . . . Loan Documents to the Servicer").  Moreover, the third party complaint refers repeatedly to actions undertaken by LNR "on behalf of" the Lender.  Accordingly, any of the allegedly culpable conduct on the part of LNR can be attributed to the plaintiff Lender, and thus the defendants lack a legal basis to assert a contribution claim against LNR under New York law.

The defendants' claim for implied indemnification also fails.  In order to establish implied indemnification against LNR, the defendants would have to establish that it "cannot be held responsible for the underlying injuries to any degree." KBL Corp. v. Arnouts, 646 F. Supp. 2d 335, 344 (S.D.N.Y. 2009) (quoting Buchwald v. Verizon N.Y., Inc., 860 N.Y.S.2d 360, 361 (App. Div. 2008)).  Here, the defendants admit that they disclosed information relating to only a majority of the leases at issue by making property reserve disbursement requests. Notwithstanding the fact that it is questionable whether these requests would actually put LNR and the plaintiff Lender on notice of leases under negotiation, the defendants' admission that they failed to provide all relevant information prevents them from establishing that they "cannot be held responsible for the underlying injuries to any degree," and, therefore, there can be no claim for implied indemnification.  See KBL Corp., 646 F. Supp. 2d at 344.

In sum, both the General Release and the insufficiency of the factual allegations supporting the defendants' claims provide separate reasons to dismiss the third party complaint. LNR's motion to dismiss the defendants' third party complaint is **granted**.

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is **denied**.  The third party defendant's motion to dismiss the third party complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is **granted**.  The remaining arguments of the parties are either moot or without merit.

The clerk is directed to close all pending motions.

**SO ORDERED.**


Dated:     New York, New York
           January 28, 2017            _____/s/_____
                                              John G. Koeltl
                                       United States District Judge

37